# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEWIS J. GRILL and** | : | |
| **CARMELA C. GRILL,** | : | |
| | : | **Civil No. 1:12-CV-00120** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **GREGG R. AVERSA and** | : | |
| **THE SAGE CORPORATION,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM OPINION

## I.  INTRODUCTION

"Happy families are all alike; every unhappy family is unhappy in its own way."

Leo Tolstoy, quoted in Orchard v. Covelli, 590 F. Supp. 1548, 1550 (W.D. Pa. 1984)

aff'd sub nom. Appeal of Orchard, 802 F.2d 448 (3d Cir. 1986) and aff'd, 802 F.2d

448 (3d Cir. 1986).

Three decades ago, Gerald J. Weber, a renowned federal judge in Pennsylvania

who was confronted with a familial dispute which erupted in the context of a closely-

held family corporation perceptively noted that Tolstoy's philosophical paradigm

regarding the nature of unhappy families bore "an alarming similarity in the demise

of such [corporate] entities where the survival of a business association is so

perilously tied to the continuing vitality of intimate personal relationships.  Many

lawsuits arising from disputes among shareholders in closely-held corporations are characterized by the parties' inability to separate the business and personal aspects of their relationship." Id.

Today we are called upon to consider anew the wisdom of Judge Weber, and Tolstoy, as we examine another corporate dispute cast against the backdrop of an "unhappy family [that] is unhappy in its own way." The protagonists in this lawsuit, Lewis Grill and Greg Aversa, are brothers-in-law. Grill's sister is Aversa's wife. However, these familial ties are not the only bounds that link Grill and Aversa to one another. Grill and Aversa are also shareholders in Sage Corporation, a closely held family corporation in which Aversa owns a majority interest and Grill is a minority shareholder.

These parties, and relatives, are now embroiled in a lawsuit in which each accuses the other of misappropriation of corporate assets and opportunities, and each contests claims of shareholder oppression. Such claims by parties who share familial ties, sadly, are not new to the law. Quite the contrary: "Frequently, closed corporations originate in the context of relationships personal in nature, often undertaken by family members or friends. It is ironic that these enterprises become a most frequent setting for the exploitation of minority shareholders when the

personal relationship has gone sour" <u>Orchard v. Covelli</u>, 590 F. Supp. at 1557 (citations omitted).

Before the Court is Plaintiffs' motion for a preliminary injunction in the form of a Court order requiring Defendants to reinstate the employment of Lewis J. Grill pending the resolution of this lawsuit. Defendants oppose the motion, asserting that Grill's employment was properly terminated in August 2012, during the pendency of this litigation, after it was discovered that Grill was refusing to follow corporate policy and the specific directives of Sage's President; was improperly competing with his former employer by diverting corporate opportunities; and had improperly deposited funds payable to Sage into accounts of other business concerns that Lew Grill controls. The Court held two days of evidentiary hearings on the motion on October 16 and 25, 2012. Upon consideration of the motion, and the evidence that was developed during the hearings, we find that Plaintiffs have failed to sustain their motion for preliminary injunctive relief, and the motion will be denied.

## II.   <u>PROCEDURAL BACKGROUND</u>

The Sage Corporation is a private company, a closely-held, family-owned corporation that provides education and training to commercial truck drivers. Plaintiff's Lewis J. Grill and Carmela C. Grill, husband and wife, and minority shareholders of the Sage Corporation, commenced this action on January 23, 2012,

seeking injunctive relief against Sage and its President and majority shareholder, Gregg R. Aversa. In the original complaint, Plaintiffs claimed that Aversa was mismanaging Sage, engaging in corporate malfeasance, and indulging in shareholder oppression. Plaintiffs accordingly sought equitable relief in the form of a court order requiring Defendants to produce, or permit Plaintiffs, their agents, and representatives, to gain access to corporate records in accordance with Pennsylvania law. (Doc. 1.)

On January 24, 2012, Plaintiffs moved for a preliminary injunction to permit, *inter alia*, the inspection of Sage's corporate books and records. (Doc. 3.) After being granted an extension of time to respond, Defendants filed a brief opposing the motion on February 17, 2012. (Doc. 14.) On May 30, 2012, the Court held an evidentiary hearing on the motion. Following testimony by Lew Grill and Joseph Barbagallo, a forensic accountant that the Grills retained to examine Sage's corporate, accounting, and financial records, the parties engaged in settlement discussions outside the Court's presence, and ultimately reached an agreement that resulted in the motion for a preliminary injunction being withdrawn.

From this initial dispute the litigation proceeded forward solely as a shareholder disclosure case until September 14, 2012, when the Grills filed the motion for preliminary injunctive relief that is currently awaiting resolution. (Doc.

38.) In this motion, Lew Grill alleges that he was improperly terminated from his employment with Sage in August of 2012, during the pendency of this litigation. The Grills seeks a court order directing Defendants to reinstate Lew Grill to his employment with Sage pending the resolution of this lawsuit. Grill argues that this equitable relief is warranted under the circumstances of this case, arguing that he is likely to prevail on the merits of the lawsuit; that money damages cannot compensate him for the injuries caused by his termination; that the injunction would not be injurious to other interested parties; and that the requested relief is in the public's interest.

After filing their motion for a preliminary injunction, Plaintiffs also moved for leave to file an amended complaint to include new claims and additional legal and equitable theories of relief. That amended complaint was filed on September 20, 2012 (Doc. 43.), and includes claims for shareholder oppression under Pennsylvania statutory law (Count I); claims for injunctive relief that would permanently prohibit Defendants from terminating the Grills' employment and would require Defendants to cease conducting all business without consulting with and obtaining the consent of the Grills (Count II); claims for breach of fiduciary, loyalty and good-faith duties (Count III); claims that Aversa engaged in legal and equitable fraud by deliberately and materially misleading Plaintiffs as minority shareholders of Sage (Count IV);

claims for conversion and unjust enrichment (Counts V and VI); a claim that the Court should impose a constructive trust over all of Sage's assets (Count VII); and a claim for wrongful and retaliatory termination of Lew Grill (Count VIII). In the amended complaint, Plaintiffs seek a range of equitable and legal relief, including compensatory and punitive damages, attorneys' fees, costs and expenses, front and back pay, the reinstatement of Lewis Grill to employment with Sage, "and that he continue to receive his salary as an employee of Sage." (Doc. 43, at 33.)

It is this last claim for wrongful and retaliatory discharge that forms the primary basis for Plaintiff's motion for preliminary injunctive relief. Defendants filed a brief in opposition to the motion on October 4, 2012, and the Court promptly scheduled an initial hearing on October 16, 2012. At the close of that first day of testimony, the parties advised the Court that they would require at least one additional day of evidentiary presentation and argument. Accordingly, the Court reconvened the hearing on October 25, 2012. At the conclusion of these two days of hearings, the Court took the matter under advisement.

### III.   **FACTUAL BACKGROUND**

The following represents a summary of the evidence presented during the two days of hearings held on the motion.

*A. Lew Grill is an Established and Recognized Expert Witness*.

Lewis J. Grill represents himself as a renowned figure in the truck driving and education industry, who has built a particular niche as an accident reconstruction expert witness in truck driving litigation throughout the United States. In this regard, the proceedings opened with brief testimony by David B. Dowling, Esq., a Harrisburg lawyer who testified that he has retained Lew Grill's services as an expert witness for the plaintiffs in a personal injury action captioned <u>Anh Nguyen, et al., v. McCammon Trucking, Inc.</u>, which is currently pending in the Court of Common Pleas of Berks County. (Doc. 56, Notes of Testimony, at 8) (hereafter "N.T. at ___.").

Mr. Dowling testified that when he retained Grill's services, he believed he was retaining Grill alone, although he appears to have found Grill through a website maintained by Sage. (<u>Id.</u> at 9.) Dowling testified that Grill struck him as someone who had experience as a truck driving educator, someone who had experience testifying in court, and who was articulate about truck driving standards of care. (<u>Id.</u>) Finding this mix of skills and experience made Grill "the ideal expert", Dowling engaged his services in the <u>Nguyen</u> case. (<u>Id.</u>)

When Dowling was presented with a series of questions about the potential consequences to his clients if Grill was unable to testify as an expert in the <u>Nguyen</u> case, Dowling offered that his chances of winning the action would be diminished

and "impacted significantly". (Id. at 10.) Indeed, Dowling represented that given the posture of the pending litigation, he was uncertain about whether he could realistically obtain a new expert at this late date, and even if he could he "doubt[ed that he] would find someone like Mr. Grill." (Id.) Dowling also testified that if Sage offered to provide a substitute or replacement expert in Mr. Grill's absence, he would decline the offer as unacceptable. (Id. at 11.)

In response to cross examination, Dowling acknowledged that he had only retained Grill in the Nguyen lawsuit and no other litigation. (Id. at 12-13.) Dowling testified that Lew Grill told him immediately prior to the hearing that there was some doubt as to his ability to fulfill his role as an expert witness in the Nguyen case, owing to Defendants' termination of his employment. (Id. at 15.) However, in response to further questioning, Dowling acknowledged that if Sage permitted Grill to testify in the Nguyen case, then Grill's employment status with the Sage Corporation would not harm Dowling's clients or their case. (Id. at 16.)

The Grills next played for the Court a very brief video deposition of Bruce Dickinson, Esq., a lawyer based in Las Vegas who specializes in truck driving litigation, and who has retained Lew Grill's services on multiple occasions in various civil actions. (Id. at 20.) In the interest of completeness, the Court permitted the introduction of this evidence over Defendants' objection, an objection that was based

upon an asserted lack of notice sufficient to permit Defendants to prepare for – or even attend – Mr. Dickinson's deposition in Las Vegas. Mr. Dickinson provided very limited testimony, testimony that largely conformed with and supplemented David Dowling's description of Lew Grill as an ideal expert witness, and one whose testimony and role was essential in ongoing litigation in which Mr. Dickinson was engaged as counsel. Dickinson further testified that he had utilized Grill's services as an expert over a number of years, in multiple cases dating back to the mid 1980s – a time that predated Sage's existence as a company.

> **B.** **Lew Grill is a Renowned Figure in the Areas of Truck Driver Education and Safety, and His Involvement in Ongoing Education and Safety Projects is Important.**

Plaintiffs next called Frank Molodecki. Molodecki testified that he has been involved in the trucking industry for more than 35 years, about 23 of which was spent as a driver. (October 16, 2012 N.T. at 26.) Molodecki was associated with Sage at its Billings, Montana location as a part-time instructor for approximately three years, and has more recently been transitioning into the area of truck driving safety. (Id.) Molodecki currently works for Diversified Transfer and Storage, where he oversees the company's safety department, and helps to set policy, training, and safety goals for the company. (Id.)

During the time he was employed by Sage in the late 1990s, Molodecki worked as a part-time instructor, helped to write curricula, and served on the company's advisory board. (Id. at 27.) During this time, Molodecki became acquainted with Lew Grill, who became "an instrumental lead" in Molodecki's training and development as an instructor. (Id. at 28.) Molodecki testified that Grill brings a rich constellation of skills and expertise to his various roles in the truck driving industry, including the experience of serving as a truck driver, the ability to communicate fluently with novice and expert alike, in addition to being a published author and recognized expert witness. According to Molodecki, he has never encountered another figure in the trucking industry with this combination of skill and experience. (Id.)

Moving from the general to the specific, Molodecki next testified about a cooperative agreement that had been entered into between Sage and the Federal Motor Carrier Safety Administration ("FMCSA") – an agreement that makes use of a peer review board on which Molodecki sits as a member. Molodecki testified that the cooperative agreement between Sage and the FMCSA was intended to study the effectiveness of fostering a culture of safety among motor carriers, with a particular focus on new entrants in the trucking industry, and ensuring that these new entrants receive sufficient safety training prior to operating on the roads. (Id. at 31-33.)

Molodecki said that Sage and the FMCSA were presently engaged in collecting a variety of data focused on training and safety, which would thereafter be assimilated, analyzed, and incorporated into future educational programming. (Id.) Molodecki testified that Lew Grill is the only person he knows of who is capable of performing the work remaining under the cooperative agreement. (Id. at 33, 43-44.)

Molodecki further offered his opinion that if Sage is unable to complete the work remaining under the cooperative agreement, it was likely to have a negative impact on highway safety. In this regard, Molodecki reiterated his observations regarding the lack of experience that persists among many new entrants in the trucking industry, and the cooperative agreement represented a way of educating these drivers earlier in the process in order to instill and maintain a safety culture among inexperienced and experienced drivers alike. (Id. at 34-35.) Molodecki also concluded that Sage's own reputation in the industry would be impaired if the company were unable to fulfill its obligations under the cooperative agreement. (Id. at 36.)

Notwithstanding these dire predictions, in response to cross examination, Molodecki testified that if Sage retained Lew Grill as an independent contractor in order to complete any remaining obligations left under the cooperative agreement prior to its expiration in 2014, "it would probably mitigate [his concerns about public

safety] to some extent." (Id. at 47.) He acknowledged that "[t]he main thing is that it gets done and we get it done in a timely fashion." (Id. at 47-48.) Ultimately, Mr. Molodecki summarized his view of this hypothetical proposal as follows: "If both parties are involved and were able to get to the end result of the initial, of the initial program and were able to get to the fact finding and ultimately, as I hope, will come into a federal rule-making, I think we're fine." (Id. at 49.)

In summary, Molodecki agreed that his concerns regarding harm to the public interest or to Sage would be alleviated if Sage retained Grill as a contractor so that he could fulfill any remaining obligations under the cooperative agreement. In this regard, Molodecki's testimony conformed to that of David Dowling, the lawyer who retained Grill's expert witness services, and agreed that if Sage permitted Grill to fulfill the remainder of his obligation to Dowling and his clients, they would suffer no harm.

As the foregoing summary indicates, there appears to be evidence of a consensus among members of the legal community and the trucking industry that Lew Grill brings a highly sought-after combination of skills, experience, charisma, and ability to his many roles as an educator, expert witness, and data analyst, and that professionals in the legal and trucking industry recognize him as a singular figure in their respective fields. At the same time, there was also consensus at the evidentiary

hearings that, regardless of Grill's eminence in these areas, if Grill is engaged as an independent contractor on specific projects such that he could fulfill his outstanding obligations under contracts and professional engagements, then any harm to the third parties or the public relying on his performance of those service obligations would effectively be resolved.

### C. The Grills' Own Testimony

Following the testimony presented by the lawyers and Molodecki, the Grills were called as witnesses in support of their motion.

Carmela Grill testified that she is employed by Sage as a school and statewide director, and has responsibility for all modes operation for the education and safety departments at Sage's Billings, Montana campus+. In this regard, Mrs. Grill is responsible for field operations that she or her teams of instructors take in the state, which can be up to ten different locations statewide. (N.T. I at 54.)

Mrs. Grill was next asked a series of questions regarding the cooperative agreement between Sage and the FMCSA. Testifying that the agreement constituted "[a] lifetime of work," Mrs. Grill stated that the cooperative agreement constituted a highly desirable, and rare, single-source funded project. This status meant that the government had determined that Sage was deemed qualified to be the only source with whom they wished to contract for the services under the cooperative agreement,

because of Sage's expertise. Such an agreement represents "the ultimate level of funding [because] [y]ou don't have to compete." (Id. at 55.)

Mrs. Grill testified that she and her husband have jointly been working in the transportation industry for many years, with Lew Grill having the most experience of either of them. (Id.) According to Carmela Grill, she and Lew had developed substantial contacts in the United States Department of Transportation over two decades, and they had made a concerted effort to cultivate these relationships with the DOT and other federal agencies. (Id.) These contacts contributed directly to the ability of Sage to enter into the cooperative agreement, and to achieve single-source funding.

The cooperative agreement has involved services spanning a number of years. Thus, in September 2008, Sage submitted a technical proposal that was the result of approximately nine months of work between the Grills and two government employees. (Id. at 57.) Generally speaking, the work involved a multi-year process of safety studies focused on answering the question of what impact a "safety culture" would have on small motor carriers operating on the roadways with no experience. (Id. at 59.) The "big picture" envisioned by the parties to the cooperative agreement was to study and analyze data on the impact of educating new entrants in a safety culture, and to use the statistics developed during the multi-year data collection

process to help lobby for, and enact, new federal regulations governing the trucking industry.  (Id.)

This process has involved years of work, actually stretching back to 2005, before the cooperative agreement was entered into, and is not yet completed.  During this time, the participants, including Sage, through the Grills, has developed the curricula and educational materials used, and had the curricula and materials approved by a peer review board.  (Id. at 60.)  Once that was completed, the parties undertook to train 200 motor carriers through orientation and a mock audit similar to that conducted of new entrants within the first 18 months of operation.  (Id.)  The hypothesis underpinning the cooperative agreement was that once new entrants were trained in accordance with this developed curriculum, they would exhibit fewer road accidents, resulting in fewer crashes, citations, breakdowns, and decreased interaction with law enforcement or governmental agencies owing to increased driver education. In Carmela Grill's words, "They knew how to do it, so therefore they would be better at it."  (Id.)

The government initially allocated $500,000 for the study, but this proved insufficient for all that needed to be done, and in 2010 an additional $175,000 was made available for continued work and tasks.  (Id.)  With the addition of these new

funds, the work on the cooperative agreement is scheduled to conclude on April 30, 2014.  (Id. at 61, 63.)

Mrs. Grill testified that she is the program director under the cooperative agreement, which makes her responsible for daily operations and dispatching, although she said that "[t]echnically, that person should have been Lew."  (Id. at 65.) Apparently, because Lew Grill bills out for services at a rate of $300 per hour, Sage's Billings campus depended on Lew to raise revenue, and the government could not afford to pay him at his standard rate.  (Id. at 65.)  These economic considerations caused Sage to be very selective about how Lew's time was allocated under the cooperative agreement, to ensure that his time was used efficiently and effectively. (Id. at 65-66.)  According to Carmela, Lew's role in the project has been varied over time, with concentration early on in developing training materials, and now in synthesizing and analyzing the data collected, which will ultimately be presented to federal regulators and lawmakers.

Among her other tasks, Mrs. Grill is responsible for finalizing and filing quarterly reports providing progress updates on work that has been done, the results of the data gathered during that reporting period, and a general update to the government's contracting officer.  (Id. at 61.)  However, although she is listed as the

preparer and filer, Mrs. Grill emphasized that Lew Grill was ultimately the person who reviewed and finalized the reports that were filed. (Id. at 63.)

In addition to his other responsibilities, Mrs. Grill testified that her husband took the lead in presenting information and study results to high-level officials with the Department of Transportation regarding the results of the ongoing study and assessment of safety education being undertaken as part of the cooperative agreement. (Id. at 67.) She also testified that Lew Grill was the person the company relied upon to carefully read and understand the relevant regulations so that carriers could be accurately informed regarding legal requirements governing the operation of their trucks. (Id. at 68.)

Carmela Grill testified that the state of the cooperative agreement is "very vulnerable right now." (Id. at 69.) She based this assessment on the fact that the cooperative agreement is entering the final stage of data collection for 25 of the 200 motor carriers who participated in the study, and the "heavy portion" of Lew Grill's contribution to the project is "just beginning because he is the one that has to evaluate, critique, and rewrite, and then he has to be prepared to defend and present and hold it up." (Id. at 70.) For her part, Carmela stated that she "would have no abilities to defend" the results of the study, and lacks the skill and experience to communicate effectively and persuasively with lawmakers who will be the target of

efforts to have new regulations promulgated based on the anticipated results of the cooperative agreement's data analysis. (Id. at 70.) Instead, she testified that this aspect of the project would fall on Lew Grill's shoulders, who boasts the "ability to quickly answer why the program is strong in this area and why it's needed and why it will make highways safer, reduce fatalities and injury, [and] reduce the cost to insurance companies." (Id.)

When asked whether she would be able to assume Lew's responsibilities if Lew was no longer a Sage employee, Carmela Grill testified that should could not, in part because of Lew's experience and skillset, and in part because deadlines are fast approaching under the cooperative agreement, and the government is expecting a timely report that Lew Grill is expected to produce. (Id. at 71.) Indeed, in her view, Carmela Grill testified that without Lew as an employee, Sage will no longer be able to meet its obligations under the cooperative agreement, since nobody else in the company can takeover Lew's responsibilities. (Id. at 72.)

If Sage fails to meet its commitments under the cooperative agreement, Carmela Grill opined that it would likely have "a huge negative impact" on the safety of the nation's roads. (Id. at 73.) In the worst-case scenario, she foresees years of hard and important work coming to naught if lawmakers decline to enact legislation and administrative officials decline to pass new safety regulations, which could lead

to "new entrants [continuing] to crash and burn and cause mayhem, injury." (Id.) Even in a best-case scenario, Carmela Grill offered her opinion that the project, and reported results, would be delayed and would ultimately be "rip[ped apart" by the peer review board responsible for vetting the results of the study. (Id.) Mrs. Grill also believes that Sage's reputation would be irreparably damaged if the company fails to meet its obligations under the agreement, since it has taken the company years to reach this point, and the loss of credibility in the industry would be, in her view, catastrophic. (Id. at 76.)

Carmela Grill testified that in addition to the ongoing cooperative agreement with the FMCSA, she and Lew Grill spearhead efforts for Sage relating to a project with Sanjel, an international motor carrier. (Id. at 79.) This business relationship dates back to 1996 or 1997, and initially focused on training entry-level drivers. (Id. at 80.) More recently, Sanjel has worked with Sage to improve Sanjel's overall safety team, and to assist Sanjel in evaluating existing drivers and new drivers alike, and setting a series of minimum safety standards for company drivers, with a particular focus on Sanjel drivers operating in and around a large oil field known as The Bakken in North Dakota. (Id.)

The bulk of this project is complete, and involved the assessments of more than 1,000 drivers, and the development and implementation of training protocol for the

company's drivers.  (Id. at 81.)  Carmela Grill testified that Lew Grill has been integral to the longstanding agreement with Sanjel, and that his presence with Sage is critical so that he can defend the training programs that were put in place if a carrier were to become involved in an accident.  (Id.)  Carmela Grill said that she could not assume Lew's duties in this regard, and she opined that Sage would be incapable of finding any other person capable of undertaking his responsibilities in his absence.  (Id. at 83.)

In response to a series of questions about the Grills improperly diverting Sage revenue and business opportunities to another entity that Lew Grill controls called Atlantic Pacific Resources Group ("APRG"), Carmela Grill testified that Lew has never had any responsibility for accounting or clerical duties for the company.  (Id. at 84.)  According to Carmela Grill, Lew Grill was not responsible for the improper or mistaken deposit into APRG's bank accounts of one or more checks that were paid on account of Sage.  (Id.)  She also testified that once it was discovered that checks for Sage had been deposited into APRG's account, she had one of her assistants investigate whether there had been any other instances of improper deposits made into APRG accounts.  (Id. at 85-87.)  According to Mrs. Grill, it was determined that the problem stemmed from clerical errors made by bank tellers at a branch of U.S. Bank in Montana, and that all deposits owed to Sage were returned.  (Id. at 87.)

Among many other areas explored during cross examination, Carmela Grill was asked whether Lew Grill could fulfill any final tasks or responsibilities he had under the cooperative agreement with the federal government if he were retained and paid as an independent contractor by Sage. (Id. at 99.) After arguing that the Grills have been unable to reach an agreement with Sage on anything, she conceded that "if they could come to an agreement, we would not have any issues". (Id.) Furthermore, Mrs. Grill conceded that the public would not be harmed if Lew Grill and Sage could negotiate an agreement that would allow Lew Grill to complete his portion of the cooperative agreement by the April 30, 2014, completion date. (Id. 100-101.)

Lew Grill was the final witness to testify on the first day of hearings on the motion. Lew Grill testified that he had the concept for founding Sage back in 1989, and that its creation was really just the further development of a platform he had been working on for two years. (Id. at 120.) Although by 2012 he was a minority shareholder and employee of the company he helped to found, when asked by his counsel what duties he was charged with at the time of termination in August 2012, Lew Grill responded that he was never charged with duties, but instead explained that he simply "answer[s] to [himself]. [He] did whatever [he] thought needed to be done." (Id. at 121.) Having emphasized that he operated independently and without supervision, Lew Grill summarized his work immediately prior to being terminated

as involving transportation studies, litigation consulting, work on the Sanjel and U.S. DOT contracts, and working on acquiring the next sources of Sage's funding. (Id. at 121-22.)

Grill testified that in February 2011, Gregg Aversa began efforts to encourage Grills to retire from the company. (Id. at 122-23.) Grill said he responded by noting that he would be 62 years old in August 2011, and that he would explore winding up his duties in an orderly fashion, provided he could wrap up the important projects he was working on, including the U.S. DOT cooperative agreement, the Sanjel work, and expert witness engagements. (Id. at 123-24.) Grill testified that following his meeting with Aversa, he took several initial steps towards separating from the company, including hiring an assistant, disconnecting his phone from Sage Technical Services in Billings, purchasing his own truck, and forming his own motor carrier company. (Id. at 125.)

However, Grill testified that later in August 2011, Gregg Aversa abruptly reversed course and attempted to dissuade him from retiring, and that Aversa told him he actually did not want Grill to retire from the company. (Id. at 126.) Aversa encouraged Grill to stay on with the company, but Grill resisted this because earlier negotiations had given way to "memo warfare and a family feud." (Id. at 127.) In response Aversa proposed that Grill give up the litigation consulting work that he was

performing on behalf of APRG, but this was unacceptable to Grill, and he rejected the proposal. (Id.) It appears that the dispute between the men really turned on Grill's work as an expert witness and litigation consultant, work that Grill believed rightfully belonged exclusively to him. (Id.) Grill countered Aversa's proposal by offering to focus his work for Sage exclusively on transportation studies and special projects like the DOT contract or the Sanjel work, and keeping his legal consulting work separate. (Id.) According to Grill, Aversa never responded to this proposal, and the parties have been locked in a stalemate ever since. (Id. at 127-28.)

Grill testified that he has performed work as an expert and consultant since the early to mid-1980s, approximately five years before Sage was formed. Grill stated that he was been providing these services on his own account even after Sage was formed. (Id. at 128.) According to Grill, Sage did not begin offering expert witness services until the late 1990s, at least "outside of cases that [Grill] may have gifted to Sage ... in the early 1990s." (Id.) Grill testified that he gifted these revenues to Sage during that time because the company was struggling to meet overhead costs, and required additional investment by the shareholders. (Id. at 129.)

However, in 2001 or 2002, Grill claims that he began providing litigation consulting services on behalf of Sage, while at the same time maintaining his preexisting independent expert witness services. (Id. at 132.) At present, Grill said

that he is working on 11 or 12 cases on behalf of Sage, which are at different stages in their respective litigations. (Id.) In the event his employment with Sage remains terminated, Grill testified that there is "no way" anyone at Sage could step in and complete his expert witness obligations. (Id. at 134.) Grill testified that if he cannot testify in these cases, the clients would suffer, Sage's reputation would be harmed, as would Grill's own professional standing. (Id.)

With respect to the ongoing cooperative agreement with the Department of Transportation, Grill largely amplified the testimony of Carmela Grill and Frank Molodecki, while providing some additional specific factual detail about the project's history and his specific duties. (Id. at 139-144.) When asked for his opinion about the likely harm that would be caused if he is unable to continue performing his duties under the cooperative agreement, Grill testified that his absence would be "[a]bout the same harm that would come when you take the leader out of a band out." (Id. at 144.) According to Grill, his absence would doom the project because it would lack "the same vision and the same ideas and the important work that I do[.]" (Id.) Additionally, Grill testified that Sage's reputation would suffer. (Id.)

Grill testified at length about the grave difficulty Sage would have in finding another figure in the trucking industry who could match his experience, energy, vision, technical skills and sense of purpose necessary to fulfilling his high-level roles

with the company.  (Id. at 145-48.)  The absence of such a person capable of filling

his shoes would, according to Grill, mean that Sage cannot meet its obligations under

the cooperative agreement or the ongoing relationship with Sanjel.  (Id.)

When asked by his counsel whether "it would be acceptable for you to return

to Sage in some capacity if Sage were to just dictate the terms to you?", Grill

responded, "Never." (Id. at 157.)  Indeed, Grill testified that he had always operated

independently at Sage, having always "danced a tune to my own drum." (Id.)  Grill

testified that he cannot work under restrictions or supervision, as he "[has] to work

unrestricted, [and] be able to make [his] own decisions."  (Id.)  In this regard, Grill

offered the following description of the freedom he requires in order to work

effectively:

> I have to work unrestricted, be able to make my own decisions.  In order
> to be the visionary that I am, I have to be able to make decisions on a
> fly, including with other entities, just like when we would start the DOT
> project or anything else. It is not my pattern in the past, and it's not out
> of disrespect for Mr. Aversa, it has never been my habit to pick up the
> phone and ask permission or say, oh, gee I'm thinking of designing a
> program for Indian reservations in Montana or I'm thinking of acquiring
> funding and I'm going to design a program so that 18-year-olds can
> drive interstate on custom harvesting.

(Id.)

In response to cross examination, Grill testified that regardless of whether or

not Sage reinstates his employment, he is going to finish working on the remaining

cases in which he has been engaged to provide expert and consulting services.  (Id. at 158.)  However, Grill testified that his reinstatement would benefit the company, the public at large, Sage's clients, and Grill personally.  (Id. at 160.)  Grill offered this testimony while at the same time holding fast to his insistence that he can not be subject to any restrictions or supervision by other Sage officers.  (Id.)

In fact, Grill acknowledged that Gregg Aversa had extended him an offer to work on terms as an independent contractor at a pay rate of $53.41 per hour in order to complete his work under the U.S. DOT contract and his expert witness engagements.  (Id. at 160, 163.)  However, Grill rejected the offer as inadequate and unacceptable, apparently based on the economics alone.  (Id.)  Grill made it clear that "I'm not willing to do it for $53.41," particularly in the absence of any consideration of insurance or other benefits.  (Id. at 164.)  In Grill's words, "Are you saying it's just a flat $53 an hour?  Unacceptable."  (Id.)  Conceding that he rejected the offer because he believed he was not being offered enough money, Grill noted that he could bill out at a rate of $300 per hour with other business opportunities.  (Id. at 165.)

Grill acknowledged that he offers similar services through APRG that he provided as an employee of Sage, but he rejected any suggestion that by doing so he was competing with his employer.  (Id. at 165-168.)  These services are, however,

lucrative: Grill testified that in 2011, APRG earned $565,450, most of which was for expert witness and litigation consulting services that he provided. (Id. at 168, 183.) Although he was unable to recall specifically, it was suggested that Grill may have performed about 1,000 hours of professional services on behalf of APRG in 2011, and far less than that for expert witness and legal consulting work on behalf of Sage during the same time. (Id. at 183.) During his testimony, Grill was shown different versions of his curriculum vitae, with recent versions prepared in 2012 that referred to APRG, and prior versions that did not. (Id.) Grill also testified that although Sage had a policy that forbade employees from competing with the company, that policy was never enforced and thus, in his opinion, "did not exist." (Id. at 180.)

During the second day of testimony, the Court heard from four witnesses. The first witness, Joseph Barbagallo, is a certified public accountant who specializes in forensic reviews of corporate books and records. The Grills retained Mr. Barbagallo to review Sage's books in connection with their claims of corporate mismanagement and shareholder oppression. The Court permitted Mr. Barbagallo to testify as an expert, and to offer opinions about the company and its management that he formed following a 10-day examination that was, according to Barbagallo, somewhat restricted. (N.T. 207.) Although Mr. Barbagallo testified at some length summarizing the specific investigation that was undertaken, and the specific areas

where he preliminarily found that the company and its officers had misused corporate resources, engaged in self-dealing, and otherwise engaged in some degree of corporate malfeasance, we find it unnecessary to provide a lengthy recitation of Mr. Barbagallo's testimony, since it is ultimately not material to resolving the pending motion, which concerns Lew Grill's motion to be reinstated as an employee of Sage. Suffice it to say that during his testimony, Barbagallo summarized his preliminary report, and each of the specific findings of mismanagement or corporate waste; but although his testimony was clearly related to the Grills' shareholder claims, his testimony did not bear directly or substantially on the Grills' motion for a preliminary injunction, which seeks the reinstatement of Lew Grill as an employee. (N.T. 202-268.)

Thus, this testimony provided some general support for Grills' broad claims of corporate mismanagement by Aversa, albeit support for these claims that was hotly contested by defendants who presented countervailing evidence rebutting these assertions. Mr. Barbagallo's testimony, however, did not speak directly to the issue of Lewis Grill's alleged wrongful termination, and at most only provided some evidence from which one might draw an adverse inference regarding the motive for Aversa to seek to terminate his brother-in-law Grill. Accordingly, we decline to provide a detailed recitation of that testimony in this memorandum.

### D.    The View From Sage's Perspective

The Court also heard from three Sage officers: Gregg Aversa, the company's President and Chief Executive Officer; Aversa' son-in law, Corporate Vice President Christopher Thropp, and Sage's chief financial officer, James MacDonald.[1] Collectively, these witnesses provided a starkly contrasting view of this intra-family dispute which has played out against the backdrop of this closely held family corporation.

At the outset, Gregg Aversa testified at some length about his own professional background in education and business leading up to the formation of Sage in 1989. (Id. at 268-276.)  According to Aversa, when he formed Sage along with Lew Grill he was unaware that Grill performed expert witness services, although he learned of this a few years later.  (Id. at 277.)  After Sage was formed, Aversa also learned that the Grills controlled APRG, and used that entity for the publication of educational materials, some of which Sage purchased for use in its own business.  (Id. at 276-77)  Because Sage did not provide those publication services, Aversa did not believe that the Grills were competing with Sage for business opportunities in this publishing field. (Id. at 276.)

---

[1] The Court is unaware of any familial ties that MacDonald has to any of the protagonists in this dispute.

In the late 1990s, Aversa learned that one of Sage's school directors was planning to start a school of his own within the same area that Sage provided services. (<u>Id.</u> at 285.) This prompted Aversa and other Sage officers to have employees of the company sign non-compete agreements. (<u>Id.</u>) Lewis Grill executed such an agreement. (<u>Id.</u> at 286-87.)

In addition to the non-compete agreement that employees signed in or around 1997, since the company's founding Sage had in place an employee manual that required employees to devote their full business time to the affairs of the Sage Corporation, and to conduct their personal affairs in such a manner that did not conflict with the company's interest or infringe on the employee's loyalty to the company. (<u>Id.</u> at 289.) As an employee, Lew Grill was provided with a copy of this company policy. (<u>Id.</u>)

According to Aversa, in the early 2000s, Lew Grill approached him with a plan to incorporate legal consulting and expert services to the business services Sage provided. (<u>Id.</u> at 290.) The company immediately began marketing these services, and supported Lew's efforts in this area by covering his expenses and paying for his continued education at Northwestern University, where he studied for and obtained a certification in accident reconstruction. (<u>Id.</u>) At the time Lew Grill was developing this work for Sage, he was also working as a Sage employee, and being paid a salary.

(Id.)  Aversa testified that the addition of this work was beneficial to Sage, and that the company remains engaged in this area, although less so now because Grill has limited the amount of consulting he does for the company.  (Id. at 290-91.)

In connection with the downturn in legal consulting work that Sage was realizing, Aversa noted that he began having difficulty contacting Lew Grill, and the company discovered instances in which funds owed to Sage for legal consulting work had been sent directly to Lew and Carmela Grill, and deposited in APRG accounts. (Id. at 291.)  From 2010 until 2012, Sage has had seen a marked decline in legal consulting work coming into the company, and in 2012 there have been months with no revenues at all for these services.  (Id.)  This trend caused Aversa to believe that Grill was diverting the consulting work to his other business interests, and undercutting Sage in the process.  (Id. at 291-92.)  Acting on evidence that the Grills were essentially taking legal consulting business away from Sage and diverting it to the Grills' own company, Sage engaged a consultant to review the computers and equipment in Sage's Billings, Montana school.  (Id.)  Aversa reviewed the data collected during this investigation and discovered that the Grills were sending out invoices on APRG or personal letterhead for legal consulting services.  (Id. at 294.) In some cases, Aversa and Sage officers did not recognize the engagements, and the

majority of invoices were sent on either APRG or the Grills' own letterhead, whereas only a minimal number were sent on Sage letterhead. (Id.)

Aversa also learned in 2011 of two instances in which checks made payable to Sage for expert witness services provided by Lew Grill were deposited instead into accounts controlled by the Grills. One of these instances was uncovered by Sage. The second instance was disclosed by the Grills. In both instances, the Grills ultimately reimbursed Sage for these funds which had been deposited into their bank accounts.

Armed with this information, Aversa had Lew Grill provide him with a list of the cases that Lew was working on behalf of Sage. (Id. at 295.) In the spring of 2012, Grill provided Aversa with a list of 12 cases in which he was providing legal consulting services as a Sage employee. (Id.) On August 6, 2012, Aversa sent Lew Grill a letter providing him with specific directives that he needed to follow in order to remain employed with Sage, and flatly charging that the Grills were diverting business opportunities from Sage. Lew Grill responded to this letter on August 10, essentially demanding that Aversa retract the allegations and demands set forth in the letter, and otherwise declining to comply with the specific directives provided. (Id. at 298.) After receiving this response, Aversa made the decision to terminate Lew Grill's employment, finding that he had failed to respond to specific requests from the

company, that he continued to ignore accountability to anyone at the company, and that he was directing legal consulting work toward his own company and away from Sage, all while remaining a highly compensated Sage employee.  (Id. at 299.)

On September 10, 2012, Aversa wrote to the Grills to propose that Lew Grill continue his work on the 12 remaining cases in which he was engaged as an expert as a Sage employee, and offering to pay Grill at his salaried level on a per-hour basis in the capacity as an independent consultant.  (Id. at 302-03.)  According to Aversa, Lew Grill has never responded to this offer, which the company remains willing to honor.  (Id. at 303.)  Sage has also offered to retain Grill as an independent contractor on the same terms to finish his work on the cooperative agreement with the Department of Transportation, but the Grills have similarly declined to respond to this offer.  (Id.)  According to Aversa, Sage is prepared and able to complete the company's obligations under the cooperative agreement and under its contract with Sanjel, with or without Lew Grill's involvement.  (Id. at 303-309.)

In addition to these projects, Aversa testified that Sage is providing services under other large corporate contracts with companies such as Coca-Cola and Halliburton, and has previously worked with Federal Express.  (Id. at 309.)  Aversa testified that Lew Grill had no role in any of those contracts or business services.  (Id.)  According to Aversa, even if Sage lost its contracts with Sanjel and the United

States government, although the company would lose revenue, it would not be devastating for the company.  (Id.)

Christopher Thropp followed Mr. Aversa in providing testimony.  Mr. Thropp, who is Aversa's son-in-law, is also a Vice President of Sage, and provides a variety of services to the company in the area of operations, legal services, regulatory work, marketing, and human resources.  (Id. at 335-38.)  Thropp echoed Gregg Aversa's testimony that he was completely unaware of APRG and Lew Grill's work as an expert witness outside of Sage, when Sage began developing that line of professional services.  (Id. at 343.)  Indeed, Thropp testified that he did not learn that Lew Grill had a legal expert consulting business through a company other than Sage until early 2011.  (Id. at 344.)  The first time Thropp recalled seeing APRG listed on Lew Grill's curriculum vitae, which was in his employee file, was in May 2012.  (Id.)

In May 2011, a year earlier, Mr. Thropp discovered emails sent to Carmela Grill that were produced on Sage computers in Billings, Montana, but which related to work being performed for APRG.  (Id. at 346.)  These emails also contained spreadsheets that showed the cases Lew was working on behalf of Sage, and others that he was working on behalf of his own company.  (Id.)  According to Thropp, the spreadsheets indicated that Lew's time was being split roughly evenly between services on behalf of Sage and APRG.  (Id. at 347.)

34

Thropp also reviewed the information culled from a forensic examination of Sage's Billings, Montana computers, and discovered that the computers contained numerous documents that were related exclusively to APRG, including emails and invoices. (Id.) According to Thropp, Sage officials were entirely unaware of this work. (Id. at 348.) Finally, Thropp provided additional testimony that echoed that of Aversa, and indicated that in July 2012 he and others at Sage learned of multiple instances where monies owed to Sage for legal consulting services were actually paid directly to Lew and Carmela Grill and deposited in APRG accounts. (Id. at 349-50.) Thropp testified that before Gregg Aversa terminated Lew Grill's employment with Sage, Grill was given an opportunity to correct the problem perceived by Sage officers, rededicate himself to the company, and follow company directives, but Grill declined to respond. (Id. at 351-52.)

Following Thropp's cross examination, Defendants called James MacDonald to testify. MacDonald is Sage's Vice President of Accounting and Financial Aid. (Id. at 376.) MacDonald testified that Sage had a balance sheet audit conducted by an outside accounting firm in 2011, and it revealed no adverse findings and was overall positive. (Id. at 377.) MacDonald disputed Joseph Barbagallo's testimony earlier in the day that Sage officials were engaged in financial improprieties, and that Gregg Aversa was siphoning off corporate resources to benefit himself and his family at the

35

expense of other shareholders, such as the Grills.  (Id. at 378.)  MacDonald also offered testimony about salaries and benefits earned by company employees, and testified about fringe benefits paid to highly compensated Sage employees, including the Grills, Aversa, Thropp, and himself.  (Id. at 379-387.)  MacDonald offered his opinion about the reasonableness of the compensation being paid to Sage officers, and otherwise criticized Mr. Barbagallo's findings and methodology in reaching the conclusions of corporate mismanagement and self-dealing.  (Id.)

MacDonald also testified about Sage's investigation into Lew and Carmela's suspected diversion of corporate opportunities to APRG, the failure of the Grills to respond to his inquiries for information about the cases Lew was working on behalf Sage, and offered his opinion that even if Sage lost contracts such as the federal cooperative agreement, the company would not experience substantial difficulty since these expert witness contracts and commitments generate only a small fraction of Sage's overall corporate revenue.  (Id. at 390-94.)

## IV.  **DISCUSSION**

### A.    **Standard of Review**

In diversity actions such as the case at bar, we use a federal standard in examining requests by parties for preliminary injunctions pursuant to Rule 65 of the Federal Rules of Civil Procedure.  See Instant Air Freight Co. v. C.F. Air Freight,

Inc., 882 F.2d 797, 799 (3d Cir. 1989); see also Sys. Operations, Inc. v. Scientific Games Dev. Corp., 555 F.2d 1131, 1141 (3d Cir. 1977) ("Although the right upon which this cause of action is based is state-created, Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions."). Under Rule 65, "Four factors govern a district court's decision whether to issue a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief, (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest." Gerardi v. Pelullo, 16 F.3d 1363, 1373 (3d Cir. 1994) (quoting  SI Handling Systems, Inc. v. Heisley, 753 F.2d 1244, 1254 (3d Cir. 1985)). See also Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 170-71 (3d Cir. 2001).

Under these federal standards, it is well settled that "the grant of injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances." Instant Air Freight, 882 F.2d at 800 (quoting Frank's GMC Truck Center, Inc. v. General Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988)).  In order to satisfy this exacting standard, the party moving for a preliminary injunction must carry its burden of demonstrating both: (1) likelihood of success on the merits; and

(2) the existence of irreparable injury from the alleged misconduct. <u>Id.</u> If the movant fails to carry this burden on these two elements, the motion should be denied since a party seeking such relief must "demonstrate *both* a likelihood of success on the merits and the probability of irreparable harm if relief is not granted." <u>Hohe v. Casey</u>, 868 F.2d 69, 72 (3d Cir. 1989)(emphasis in original), (<u>quoting Morton v. Beyer</u>, 822 F.2d 364 (3d Cir. 1987)). Further, given the extraordinary nature of this form of relief, a motion for preliminary injunction places precise burdens on the moving party. As a threshold matter, it is a movant's burden to show that the "preliminary injunction must be the *only* way of protecting the plaintiff from harm." <u>Campbell Soup Co. v. ConAgra, Inc</u>., 977 F .2d 86, 91 (3d Cir.1992)(emphasis in original, citations omitted). Therefore, "upon an application for a preliminary injunction to doubt is to deny." <u>Madison Square Garden Corp. v. Braddock</u>, 90 F.2d 924, 927 (3d Cir.1937)

A plaintiff can demonstrate irreparable injury by showing that he will suffer harm that "cannot be redressed by a legal or an equitable remedy following trial." <u>Instant Air Freight</u>, 882 F.2d at 801 ("The preliminary injunction must be the only way of protecting the plaintiff from harm"). Plaintiff bears the burden of showing irreparable injury. <u>Hohe v. Casey</u>, 868 F.2d 69, 72 (3d Cir. 1989). Moreover, the plaintiff must show *immediate* irreparable injury, which is more than merely serious

or substantial harm. ECRI v. McGraw–Hill, Inc., 809 F.2d 223, 226 (3d Cir.1987). The case law offers some guidance to courts in determining whether an injury which is irreparable under this standard. "The word irreparable connotes 'that which cannot be repaired, retrieved, put down again, atoned for ...'." Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir.1994) (citations omitted).

If the movant succeeds in making this threshold showing, the court should also take into account the possibility of harm to the non-moving party or other interested persons from the grant or denial of the injunction, as well as the public's interest. Id.; see also Clean Ocean Action v. York, 57 F.3d 328, 331 (3d Cir.1995); Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 191–92 (3d Cir.1990).

In all cases, however, the preliminary injunction remedy "must be reserved for extraordinary circumstances...." Hoxworth v. Blinder, Robinson & Co. Inc., 903 F.2d 186, 189 (3d Cir.1990). If the record does not support a finding of both irreparable injury and a likelihood of success on the merits, then a preliminary injunction cannot be granted. Marxe v. Jackson, 833 F.2d 1121 (3d Cir.1987).) Courts are frequently invited to apply these exacting standards in employment disputes, where litigants seek reinstatement to specific jobs while they litigate wrongful termination claims. Yet, such requests, while frequently made, are rarely embraced by the courts which often

find that disputed employment termination decisions do not commend themselves to preliminary injunctive relief.  See, e.g., Sampson v. Murray, 415 U.S. 61, 63 (1974); Equal Employment Opportunity Comm'n v. City of Janesville, 630 F.2d 1254, 1256 (7th Cir. 1980); Ekanem v. Health & Hosp. Corp. of Marion County, 589 F.2d 316, 318 (7th Cir. 1978);  Garza v. Texas Educ. Found., Inc., 565 F.2d 909, 910 (5th Cir. 1978);  Newmon v. Delta Air Lines, Inc., 475 F.2d 768 (5th Cir. 1973).

### B.     The Plaintiffs Have Not Carried Their Burden of Proof

As a threshold matter, we are unable to conclude following two days of testimony that the Grills are likely to prevail on the merits of their claims, to the extent those claims specifically allege that Gregg Aversa wrongfully terminated Lew Grill's employment with Sage.  In reaching this conclusion we recognize that this employment termination issue arises in the context of a broader lawsuit, claiming corporate mismanagement and minority shareholder oppression.  We also acknowledged the governing standards that apply in such lawsuits, standards which hold that:

> Majority shareholders have a fiduciary obligation to minority shareholders of the "utmost good faith and loyalty." Orchard v. Covelli, 590 F.Supp. 1548, 1557 (W.D.Pa.1984), aff'd, 802 F.2d 448 (3d Cir.1986); see also Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 100-101 (3d Cir.2001) (A majority shareholder "is under close scrutiny, and is expected to conform to the highest standards of conduct"); Ferber v. Am. Lamp Corp., 503 Pa. 489, 469 A.2d 1046,

1050 (1983) ("It has long been recognized that majority shareholders have a duty to protect the interests of the minority"). Therefore, a "policy of corporate governance which has as its objective the denial of benefits to the minority interest runs afoul of this fairness standard and calls to question the majority's fulfillment of its fiduciary duty to the other shareholders." Orchard, 590 F.Supp. at 1556. This is especially true in a closely-held corporation where shares are not publically traded and a fair market is rarely available. Id. at 1557. Accordingly, Pennsylvania courts have held that majority shareholders' duty to the minority "prevents them from using their power in such a way as to exclude the minority from their proper share of the benefits accruing from the enterprise." Ferber v. American Lamp Corp., 503 Pa. 489, 469 A.2d 1046, 1050 (1983) (quoting Hornsby v. Lohmeyer, 364 Pa. 271, 72 A.2d 294, 298 (1950)). This does not mean that majority shareholders may never act in their own interest, merely that when they do act in their own interest, it must be also in the best interest of all shareholders and the corporation. Id. (citing Weisbecker v. Hosiery Patents, Inc., 356 Pa. 244, 51 A.2d 811, 814, 817 (1947)). "Pennsylvania law shifts the burden onto the fiduciary to prove that a transaction is fair and not fraudulent when the fiduciary acts to benefit himself while in the fiduciary role." Bohler-Uddeholm, 247 F.3d at 100-101.

Bair v. Purcell, 500 F. Supp. 2d 468, 483-84 (M.D. Pa. 2007). We are also mindful

of the fact that shareholder oppression can take many forms, and "'[t]actics employed

against a minority shareholder to effect such a 'freeze-out' include, but are not limited

to: generally oppressive conduct, the withholding of dividends, restricting or

precluding employment in the corporation, paying excessive salaries to majority

stockholders, withholding information relating to the operation of the corporation,

appropriation of corporate assets, denying dissenting shareholders appraisal rights,

failure to hold meetings and excluding the minority from a meaningful role in the corporate decision-making. Orchard, 590 F.Supp. at 1557." Bair v. Purcell, 500 F. Supp. 2d 468, 484 (M.D. Pa. 2007).

Yet, in this case, when we view the evidence presented by the parties, through the legal prism that defines corporate and familial responsibilities in a closely held corporations we find that, with respect to the broad issue of minority shareholder oppression, the evidence is marked by competing and conflicting cross-currents to such a degree that we cannot state that either party has with any great confidence established a substantial likelihood of success on the merits at the outset of this litigation. Quite the contrary, the principal protagonists in this litigation have each simply provided the Court with some, hotly disputed, evidence supporting their mutual suspicions of corporate mismanagement and malfeasance by other family members. Thus, Lewis Grill and Gregg Aversa each casts doubt upon the other's use, misuse and misappropriation of corporate assets and opportunities, while each enjoyed the benefits of these same corporate assets and opportunities[2]. As to this

---

[2]For example, while each party accuses the other of unfairly enriching themselves by diverting corporate assets and opportunities, it appears that all family members profited handsomely from their involvement in this joint enterprise. Thus, in 2011 Lewis and Carmela Grill collectively received salary and benefits from Sage totaling $378,321, (Def. Exhibit 13) while also earning an estimated $500,000 from expert witness and consulting fees that Sage claims as lost corporate opportunities. In turn, Gregg Aversa and his immediate family

broad issue, the evidence rests in equipoise with neither party clearly demonstrating a likelihood of success on the merits.

We further find that the evidence relating to Lewis Grill's alleged wrongful termination has the same equivocal quality. While the Plaintiff has presented evidence which would permit, but not compel an inference that this termination arises out of family acrimony and attempts at shareholder oppression, it is equally true that substantial evidence was presented demonstrating that Sage was justified in terminating Grill's employment.

That evidence showed that Sage offered litigation consulting services, largely through Lew Grill, and indeed that Grill was instrumental in developing these services for Sage. The evidence also showed, essentially without anything to the contrary, that Sage employees – including the Grills – signed non-compete agreements and were bound by an employee policy that obligated employees to dedicate their professional efforts in support of the company, and to act in a way that did not harm the company. Notwithstanding these obligations and voluntary commitments, the parties testified consistently that Lew Grill continued to perform litigation consulting on Sage's behalf, and also on behalf of APRG, and that his efforts on APRG's behalf became increasingly substantial over the past three years,

---

received salary and benefits from Sage in 2011 totaling approximately $631,363.

to Sage's detriment. These efforts have apparently increased significantly in recent years. Indeed, in 2011 alone, Grill testified that he worked a minimum of 1,000 hours on cases as a litigation consultant, and that he earned more than a half-million dollars in those cases – all of which went to APRG. During that same time, Sage watched its revenues slump from litigation consulting and expert witness work; in 2012 the company's revenues from this business have continued to plummet.

At the same time, and while this litigation was ongoing, the testimony from the Grills and Sage officers showed that monies owed to Sage for expert witness and consulting services were, on more than one occasion, improperly deposited into Sage accounts, further arousing the suspicions of Sage officers. A forensic examination of Sage computers at the Billings, Montana school provided further proof to Sage's leadership that the Lew Grill was performing substantial work on behalf of APRG, and was utilizing Sage resources in some way in connection with that work. When these concerns were brought to the Grills attention, and after specific demands were made and directives issued, Lew Grill declined to respond to them or agree to Gregg Aversa's demands.

In light of the evidence offered in support of Aversa's decision to terminate the employment of an employee who was suspected of diverting corporate opportunities from Sage, who testified openly that he is incapable of working with supervision or

subject to direction from the company's President, and who was open about the extent of his outside business interests that competed directly with Sage. On the evidence we were presented, we are not able to find that the Grills are likely to prevail on that aspect of their claims that Lew Grill's termination as an employee was unlawful or improper, or that the Grills are likely to persuade a fact finder that Lew's termination was retaliatory, and that injunctive relief restoring Grill's employment status is warranted.

But even if we were to conclude that the Plaintiffs demonstrated they were likely to prevail on the merits of their wrongful termination claim and their claim for permanent injunctive relief in the form of reinstatement, we would nevertheless be unable to find that damages would be an inadequate remedy. Indeed, the evidence is essentially undisputed that the current dispute between the parties, and whether Lew Grill can continue to fulfill his responsibilities on outstanding projects in which he was integrally involved as a Sage employee, turns largely on whether Grill believes he is being adequately compensated for the work he intends to perform.

The Sage Corporation has offered to pay Grill as an independent consultant at an hourly rate that is commensurate with the salary he was paid by the company, minus fringe benefits. Gregg Aversa reaffirmed that offer during the evidentiary hearing, and consistently testified that Sage is prepared to compensate Lew Grill for

specific projects he would undertake or windup, as an independent contractor on Sage's behalf. Lew Grill rejected this offer as inadequate, in substantial part because he claims it makes no financial sense for him to agree to these terms, since he represents he can make $300 or more operating on his own as an expert witness or litigation consultant or in some other capacity. In addition, Grill found the offer unacceptable because he is unwilling to be subject to any measure of control while working for Sage, and Aversa was demanding some measure of accountability that Grill found inappropriate. On the basis of this record evidence, which makes it clear the present stalemate is largely over money, compensation for Lewis Grills' services, we are hard pressed to conclude that money damages would be incapable of addressing any injury that the Grills could ultimately prove at trial. In short, we do not find that the injury claimed in this case is irreparable in the absence of an injunction. Having found that the Grills have failed to carry their burden on these two essential elements of a motion for preliminary injunctive relief, the motion must be denied.

However, were we to go further, and consider other factors such as the potential impact on other interested third parties or the public, we would still find an insufficient basis to issue an injunction. Although the Grills presented evidence that third parties have a distinct interest in Lew Grill's involvement in the ongoing

cooperative agreement with the federal government, work for Sanjel, and consultation to lawyers and parties in 12 active cases throughout the country as an expert witness, we are unable to find that an extraordinary preliminary injunction is necessary to safeguard these interests. Again, Sage has offered to retain Grill to continue working on these projects, and to compensate him for his work. Carmela Grill, Frank Molodecki, and David Dowling each testified that any potential harm that they perceived to third parties would be mitigated substantially or entirely if Grill were capable of working as an independent consultant. Sage has offered terms that would permit him to do just that, and to be compensated on an hourly basis in accordance with his previous salary. Lew Grill has refused this offer. Whatever the merits of his refusal, we do not find that the Court may properly issue a preliminary injunction mandating that Sage reinstate Grill to his former status as an employee of the company, or that such a drastic step is necessary given the offer that has been extended, particularly since the third-party concerns have been addressed without court intervention.

Our analysis is similar with respect to the public's alleged interest in Lew Grill's employment status. As we understand it, the Grills and their witnesses have testified that the public interest will suffer if Lew Grill is prevented from completing his important work on the U.S. DOT cooperative agreement, since that agreement is

focused on carrier safety on the nation's highways.  The Grills thus suggest that if the cooperative agreement were left incomplete, or if Grill's absence leads to the failure by government officials to enact new transportation regulations that are hoped for based upon the anticipated results of the multi-year study, the public would be harmed.

As an initial matter, we would have some difficulty accepting this conclusion, since it is so speculative at this time.  The agreement itself will not be complete until April 2014, and the actual results of the data collected under the agreement is unclear. But even if we could find that the public has a cognizable interest in having Grill remain involved in the cooperative agreement until its conclusion in 2014, we would not find that the issuance of a preliminary injunction mandating Grill's reinstatement as an employee, since Sage has already indicated a willingness to have Grill continue working on the project, albeit as an independent contractor.

Further, we find that granting the preliminary injunction sought by Lewis Grill would adversely harm the interests of Sage, the non-moving party.  The nature of this harm to Sage flows directly from Grill's conception of his job, a vision of his employment which equates any form of corporate governance with oppression.  As Lewis Grill explained to the Court,  he must be free to operate independently at Sage, having always "danced a tune to my own drum."  (Id.)  Grill testified that an

injunction must return him to his prior status quo, which means he cannot work under any restrictions or supervision, as he "[has] to work unrestricted, [and] be able to make [his] own decisions." (Id.) In this regard, Grill offered the following description of the freedom he requires in order to work effectively:

> I have to work unrestricted, be able to make my own decisions. In order to be the visionary that I am, I have to be able to make decisions on a fly, including with other entities, just like when we would start the DOT project or anything else. It is not my pattern in the past, and it's not out of disrespect for Mr. Aversa, it has never been my habit to pick up the phone and ask permission or say, oh, gee I'm thinking of designing a program for Indian reservations in Montana or I'm thinking of acquiring funding and I'm going to design a program so that 18-year-olds can drive interstate on custom harvesting.

(Id.)

As we observed above, a preliminary injunction is an extraordinary remedy, one that should be ordered only in limited cases, upon a compelling showing. That showing has not been made in this case. Moreover, the relief that the Grills are seeking is not only extraordinary, it is virtually undefined. Lew Grill seeks the reinstatement of his former employment, but to a *status quo ante* that we are unable to pinpoint given the changes in the employment relationship described by the parties during their testimony, and on terms that include remaining entirely free from supervision or direction by other corporate officers. The Court finds no basis to

mandate such an extraordinary, amorphous, and boundless relief in this case, and the motion will be denied.[3]

## V.   ORDER

Accordingly, for the foregoing reasons, IT IS HEREBY ORDERED THAT Plaintiffs' Motion for a Preliminary Injunction (Doc. 38.) is DENIED. Defendant's Motion for Protective Order (Doc. 46), is also DENIED.

*/S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

---

[3] Finally, we note the breathtaking scope of relief sought in this case, relief which would actually turn the principle of minority shareholder oppression on its head. This action was brought, in part, as a challenge to alleged minority shareholder oppression by the majority owners of Sage. However, what the Grills are ultimately seeking in this case appears to be the rights, as minority shareholders, to oppress the majority. Thus, in Count II of the amended complaint (Doc. 43.), the Grills seek entry of an injunction that would permanently prohibit Defendants from terminating the Grills' employment, and which would require Defendants to cease conducting all business without consulting with and obtaining the consent of the Grills. In this regard, the Grills seem to be seeking relief in this case that would permit minority shareholders to guarantee their own employment with the company, and to control all corporate decision-making, regardless of the will of the company's majority shareholders. Thus, in a case where the Plaintiffs have brought claims for minority shareholder oppression, the Plaintiffs ultimately seek injunctive relief that would result in majority shareholder oppression.